******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* WILLIAM MCCLEESE
## (SC 20081)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Pursuant to *Miller* v. *Alabama* (567 U.S. 460) and *State* v. *Riley* (315 Conn. 637), the prohibition against cruel and usual punishments in the federal constitution precludes a court from sentencing a juvenile offender to life imprisonment, or its functional equivalent, without the possibility of parole, unless the juvenile offender's age and the hallmarks of adolescence have been considered as mitigating factors in the sentencing determination.

Pursuant further to recent legislation (P.A. 15-84, § 1), a person convicted of a crime or crimes committed while such person was under eighteen years of age who received a total effective sentence of more than ten years prior to or after the effective date of the act becomes eligible for parole after serving 60 percent of his or her sentence, or in the case of sentences of more than fifty years imprisonment, after serving thirty years.

The defendant, who had been convicted of the crimes of murder, conspiracy to commit murder, and assault in the first degree, appealed from the trial court's dismissal of his motion to correct an illegal sentence. The defendant was seventeen years old when he committed the crimes and was sentenced to eighty-five years imprisonment without eligibility for parole. The sentencing court made no express reference to the defendant's youth and the hallmarks of adolescence as mitigating factors when it sentenced him. After the defendant was sentenced, *Miller* and *Riley* were decided, and P.A. 15-84 was enacted. The defendant claimed before the court deciding his motion to correct that, under the federal and state constitutions, his sentence was imposed in an illegal manner because the sentencing court made no express reference to his youth and the hallmarks of adolescence as mitigating factors. The defendant also claimed that the retroactive parole eligibility that he was afforded by P.A. 15-84 did not constitute a remedy for a *Miller* violation under the Connecticut constitution, and, thus, he was entitled to be resentenced in accordance with the dictates of *Miller* and *Riley*. The court ultimately dismissed the defendant's motion to correct as moot after the United States Supreme Court determined in *Montgomery* v. *Louisiana* (136 S. Ct. 718) that *Miller* applied retroactively but that, under the federal constitution, a *Miller* violation could be remedied by extending eligibility for parole to a juvenile offender, which remedy had already been afforded to the defendant by virtue of the passage of P.A. 15-84. On appeal, the defendant claimed that the parole eligibility afforded by P.A. 15-84 did not remedy the *Miller* violation under the Connecticut constitution, P.A. 15-84 is unconstitutional under the separation of powers doctrine embodied in article two of the state constitution and under the due process clause of the fourteenth amendment to the federal constitution, and P.A. 15-84 violates the defendant's right to equal protection under the federal constitution. *Held*:

1. The trial court properly dismissed the defendant's motion to correct an illegal sentence for lack of subject matter jurisdiction on the basis of mootness, as the parole eligibility afforded to the defendant under P.A. 15-84 was an adequate remedy for a *Miller* violation, and, accordingly, the defendant could not prevail on his claim that he was entitled to be resentenced under the state constitution: upon review of the factors set forth in *State* v. *Geisler* (222 Conn. 672) for construing the scope and parameters of the Connecticut constitution, this court declined to conclude that those factors compelled a state constitutional rule beyond what the legislature required in P.A. 15-84, because, although federal precedent requires special treatment of juveniles who are subject to harsh punishments, that precedent hinged on the severity of those punishments, and this court could not dismiss the mitigating effect that the parole eligibility afforded to juvenile offenders under P.A. 15-84 has in

this context, and the relevant text of the state constitutional provisions at issue (art. I, §§ 8 and 9), the constitutional history, Connecticut and sister state precedent, and public policy did not support any enhanced protection under the state constitution; moreover, this court determined, after considering, inter alia, the historical development of the punishment of juvenile offenders in Connecticut, recent legislative enactments, and the laws and practices of other jurisdictions, that the remedy of parole eligibility for a *Miller* violation does not categorically offend contemporary standards of decency, and this court, in the exercise of its independent judgment, concluded that such a remedy comported with the state constitution.

2. The defendant's claims that P.A. 15-84 is unconstitutional under the separation of powers doctrine embodied in article two of the Connecticut constitution and the due process clause of the fourteenth amendment to the United States constitution were unavailing: the legislature did not exceed its authority by affording the defendant parole eligibility pursuant to P.A. 15-84, as the power of sentencing is shared by all three branches of state government, the power to impose or modify a judgment of conviction is not synonymous with the power of sentencing, and P.A. 15-84 did not alter the defendant's judgment of conviction but, rather, retroactively modified the state's sentencing scheme, which falls within the legislature's power to prescribe and limit punishments for crimes and does not encroach on the judiciary's power to impose or modify a sentence; moreover, P.A. 15-84 does not violate the separation of powers doctrine by impermissibly delegating sentencing power to the Board of Pardons and Paroles, as the board's power at the parole stage is distinct from the judiciary's sentencing power; furthermore, although this court determined that the defendant had inadequately briefed his claim that P.A. 15-84 violates the due process clause of the fourteenth amendment, it nevertheless concluded, on the basis of P.A. 15-84 as enacted, that any *Miller* violation had been negated by virtue of the fact that the defendant was afforded parole eligibility under that act.

3. The defendant could not prevail on his claim that P.A. 15-84 violates his right to equal protection under the United States constitution on the ground that juveniles convicted of capital felony are entitled to resentencing under P.A. 15-84 whereas juveniles, such as the defendant, who are convicted of murder, are not: even if this court assumed that each group of juveniles that the defendant identifies are similarly situated, the legislature had a rational basis for treating them differently, as the manner in which mandatory sentences for capital felony and discretionary sentences for murder are imposed is distinct and, thus, might have warranted distinct remedies; moreover, the legislature reasonably could have determined that, because only 4 juveniles were serving mandatory life sentences for capital felony or arson murder, whereas approximately 270 juveniles were serving sentences of longer than ten years for other crimes, resentencing was simply a more feasible task for a smaller group in light of the judicial resources needed to conduct such proceedings, and the legislature potentially could have distinguished between actual life sentences for capital felony and those that are for the functional equivalent of life, including for murder, and determined that the latter, which offer the possibility of geriatric release, was worth granting to even the most culpable offenders, particularly at an advanced age when they would likely pose a much lesser threat to society but would cost the state much more to care for.

(*One justice concurring separately; one justice dissenting*)

Argued October 15, 2018—officially released August 23, 2019*

*Procedural History*

Substitute information charging the defendant with the crimes of murder, conspiracy to commit murder, assault in the first degree and conspiracy to commit assault in the first degree, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Harper, J.*; verdict and judgment of guilty of murder, conspiracy to commit murder and assault in the first degree, from which the defendant appealed to the Appellate Court, *Bishop, McLachlan* and *Dupont*,

*Js.*, which affirmed the trial court's judgment; thereafter, the court, *Clifford, J.*, dismissed the defendant's motion to correct an illegal sentence, and the defendant appealed. *Affirmed.*

*Adele V. Patterson*, senior assistant public defender, with whom was *Beth A. Merkin*, public defender, for the appellant (defendant).

*Melissa Patterson*, deputy assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Matthew A. Weiner* and *Lisa M. D'Angelo*, assistant state's attorneys, for the appellee (state).

*Kim E. Rinehart* filed a brief for the Connecticut Psychiatric Society as amicus curiae.

*Opinion*

D'AURIA, J. Under the federal constitution's prohibition of cruel and unusual punishments, a juvenile offender cannot serve a sentence of imprisonment for life, or its functional equivalent, without the possibility of parole, unless his age and the hallmarks of adolescence have been considered as mitigating factors. *Miller* v. *Alabama*, 567 U.S. 460, 476–77, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *Casiano* v. *Commissioner of Correction*, 317 Conn. 52, 60–61, 115 A.3d 1031 (2015), cert. denied sub nom. *Semple* v. *Casiano*, U.S. , 136 S. Ct. 1364, 194 L. Ed. 2d 376 (2016); *State* v. *Riley*, 315 Conn. 637, 641, 110 A.3d 1205 (2015), cert. denied, U.S. , 136 S. Ct. 1361, 194 L. Ed. 2d 376 (2016). The defendant, William McCleese, a juvenile offender, was originally serving a sentence of imprisonment for the functional equivalent of his life without the possibility of parole, in violation of this constitutional mandate. Because of subsequent legislation, however, he will be eligible for parole in or about 2033. This appeal requires us to decide whether the legislature may remedy the constitutional violation with parole eligibility. We conclude that it may and has done so.

The following undisputed facts and procedural history, as contained in the record and the Appellate Court's decision in the defendant's direct appeal, are relevant to this appeal. The defendant was seventeen years old when he and a partner shot and killed one victim and injured another. *State* v. *McCleese*, 94 Conn. App. 510, 512, 892 A.2d 343, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006). In 2003, a jury found the defendant guilty of murder in violation of General Statutes § 53a-54a (a), conspiracy to commit murder in violation of § 53a-54a (a) and General Statutes § 53a-48 (a), and assault in the first degree in violation of General Statutes § 53a-59 (a) (5). Id., 511.

The defendant received a total effective sentence of eighty-five years of imprisonment without eligibility for parole, including sixty years on the conviction of murder. Although the sentencing court, *Harper, J.*, considered other mitigating evidence and mentioned the defendant's youth several times, there is no express reference in the record that it specifically considered youth as a mitigating factor, which, at the time, was not a constitutional requirement. See *Miller* v. *Alabama*, supra, 567 U.S. 460. The Appellate Court affirmed his conviction on direct appeal; *State* v. *McCleese*, supra, 94 Conn. App. 521; and this court denied his petition for certification to appeal from the Appellate Court's judgment. *State* v. *McCleese*, 278 Conn. 908, 899 A.2d 36 (2006).

Subsequently, decisions by the United States Supreme Court, decisions by this court, and enactments by our legislature resulted in changes to the sentencing

scheme for juvenile offenders. Those changes will be set forth more fully in this opinion, but a brief summary helps to understand the procedural posture of this case. Specifically, the United States Supreme Court in *Miller* held that the eighth amendment's prohibition on cruel and unusual punishments is violated when a juvenile offender serves a mandatory sentence of life imprisonment without the possibility of parole because it renders "youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence" and "poses too great a risk of disproportionate punishment." *Miller* v. *Alabama*, supra, 567 U.S. 479. Thus, an offender's age and the hallmarks of adolescence must be considered as mitigating factors before a juvenile can serve this particular sentence.[1] This court has interpreted *Miller* to apply not only to mandatory sentences for the literal life of the offender, but also to discretionary sentences and sentences that result in imprisonment for the "functional equivalent" of an offender's life. *State* v. *Riley*, supra, 315 Conn. 642, 654; see also *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 72. We also have ruled that *Miller* applies not only prospectively, but retroactively, and also to challenges to sentences on collateral review. *Casiano* v. *Commissioner of Correction*, supra, 71.

To comport with federal constitutional requirements, the legislature passed No. 15-84 of the 2015 Public Acts (P.A. 15-84).[2] In relevant part, the act retroactively provided parole eligibility to juvenile offenders sentenced to more than ten years in prison. See P.A. 15-84, § 1. As a result, the defendant is no longer serving a sentence without the possibility of parole—he will be parole eligible after serving thirty years, when he is about fifty years old.

Following these developments, the defendant filed a motion to correct an illegal sentence. He asserted a *Miller* claim under the federal constitution and a similar claim under the state constitution.[3] Initially, the trial court, *Clifford, J.*, ruled in the defendant's favor on his federal constitutional claim but reserved ruling on a remedy for the federal violation and on the merits of the state constitutional claim.

Three days after the trial court's initial ruling on the motion to correct an illegal sentence, the United States Supreme Court held that *Miller* applied retroactively. *Montgomery* v. *Louisiana*, U.S. , 136 S. Ct. 718, 732, 193 L. Ed. 2d 599 (2016). In other words, a *Miller* violation existed if a juvenile offender was serving life without parole without the trial court's having considered the *Miller* factors, even if the sentencing took place before *Miller* had been decided. Although this court in *Casiano* had already established that *Miller* applied retroactively, critically, *Montgomery* also made clear that "[*Miller*'s] retroactive effect . . . does not require [s]tates to relitigate sentences, let alone convictions,

in every case [in which] a juvenile offender received mandatory life without parole. A [s]tate may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." Id., 736.

Relying on *Montgomery*, the state filed a motion to reconsider the trial court's ruling granting the defendant's motion to correct an illegal sentence. After briefing and argument, the court granted the motion to reconsider, concluded that the defendant's *Miller* claim was now moot under both the federal and state constitutions, and dismissed the motion to correct an illegal sentence. The defendant appealed from that decision to the Appellate Court. The defendant's appeal was then transferred to this court. See Practice Book § 65-2.

In this appeal, we must decide whether the trial court had subject matter jurisdiction over the defendant's motion to correct an illegal sentence. Subject matter jurisdiction "involves the authority of the court to adjudicate the type of controversy presented by the action before it." (Internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 533, 911 A.2d 712 (2006). The existence of jurisdiction is a question of law, and our review is plenary. Id., 532. A trial court generally has no authority to modify a sentence but retains limited subject matter jurisdiction to correct an illegal sentence or a sentence imposed in an illegal manner. *State* v. *Delgado*, 323 Conn. 801, 809, 151 A.3d 345 (2016). Practice Book § 43-22[4] codifies this common-law rule. Id. Therefore, we must decide "whether the defendant has raised a colorable claim within the scope of Practice Book § 43-22 . . . . In the absence of a colorable claim requiring correction, the trial court has no jurisdiction . . . ." (Citation omitted.) Id., 810.

In the present case, whether the defendant has made out a colorable claim depends on (1) whether the parole eligibility afforded by P.A. 15-84 adequately remedies an unconstitutional sentence under the state constitution, (2) whether, consistent with separation of powers principles embodied in the Connecticut constitution,[5] the legislature may remedy an unconstitutional sentence that was imposed by the judiciary, and (3) whether P.A. 15-84 violates the defendant's right to equal protection. We hold that the defendant has not made out a colorable claim and that the trial court lacked jurisdiction over his motion.

I

The defendant first claims that the parole eligibility afforded by P.A. 15-84, § 1, does not remedy a *Miller* violation under the Connecticut constitution. Specifically, he argues that a juvenile sentenced to fifty years or more without consideration of the *Miller* factors must be resentenced in accordance with *Miller*, regardless of whether he is eligible for parole. We disagree

and conclude that parole eligibility under P.A. 15-84, § 1, is an adequate remedy for a *Miller* violation under our state constitution just as it is under the federal constitution.

This court has not yet addressed this issue. In *State v. Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), "we identified six nonexclusive tools of analysis to be considered, to the extent applicable, whenever we are called on as a matter of first impression to define the scope and parameters of the state constitution: (1) persuasive relevant federal precedents; (2) historical insights into the intent of our constitutional forebears; (3) the operative constitutional text; (4) related Connecticut precedents; (5) persuasive precedents of other states; and (6) contemporary understandings of applicable economic and sociological norms, or, as otherwise described, relevant public policies. . . . These factors, [commonly referred to as the *Geisler* factors and] which we consider in turn, inform our application of the established state constitutional standards—standards that . . . derive from United States Supreme Court precedent concerning the eighth amendment—to the defendant's claims in the present case." (Citations omitted.) *State v. Santiago*, 318 Conn. 1, 17–18, 122 A.3d 1 (2015).

A

1

Federal Precedent

It is not critical to a proper *Geisler* analysis that we discuss the various factors in any particular order or even that we address each factor. See *Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 408, 119 A.3d 462 (2015). Because the point of departure that the defendant advocates for requires an understanding of the federal jurisprudence on the sentencing of juveniles, we begin with a survey of those precedents.

Federal precedent requires special treatment of juveniles when especially harsh punishments are imposed. The cases justify this treatment, in part, by acknowledging that juveniles are less deserving of criminal punishment and are more capable of change than their adult counterparts. But federal case law also relies on the severity of the punishments at issue in these cases: death and life imprisonment without parole. Precisely because these punishments are irrevocable, they are "disproportionate for the vast majority of juvenile offenders . . . ." *Montgomery v. Louisiana*, supra, 136 S. Ct. 736. This rationale does not support similar special treatment of juveniles who are parole eligible, notwithstanding the length of the sentence imposed, because they are afforded the opportunity to "demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." Id.

The eighth amendment to the United States constitu-

tion provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. The cruel and unusual punishments clause has been understood to bar "(1) inherently barbaric punishments; (2) excessive and disproportionate punishments; and (3) arbitrary or discriminatory punishments." *State* v. *Santiago*, supra, 318 Conn. 19. "For the most part, however, the [United States Supreme] Court's precedents consider punishments challenged . . . as disproportionate to the crime. The concept of proportionality is central to the [e]ighth [a]mendment." *Graham* v. *Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). There are two types of proportionality challenges: (1) "challenges to the length of term-of-years sentences given all the circumstances in a particular case," and (2) categorical challenges balancing "the nature of the offense . . . [or] the characteristics of the offender" against a particular type of sentence. Id., 60.

The United States Supreme Court's juvenile sentencing cases have involved categorical proportionality challenges, as does the defendant's claim in this appeal. Therefore, in this context, the court has weighed the characteristics of juvenile offenders against the severity of sentences of death or life imprisonment without parole.

On one hand, the court has considered "the unique aspects of adolescence . . . ." *State* v. *Riley*, supra, 315 Conn. 644–45. It repeatedly has recognized that "children are constitutionally different from adults for purposes of sentencing." *Miller* v. *Alabama*, supra, 567 U.S. 471. Juvenile offenders have "diminished culpability and greater prospects for reform" than their adult counterparts because they are less mature, more vulnerable to external influences like peers, and have character traits that are not yet fully ingrained. Id. These observations "[rest] not only on common sense—on what 'any parent knows'—but on science and social science . . . ." Id. And, none of them is crime specific. Id., 473.

On the other hand, the court has considered the severity of the punishments imposed: death or life imprisonment without parole. Sentence severity is critical to a categorical proportionality analysis. Prior to *Graham*, categorical challenges had been applied only to the death penalty. *Graham* v. *Florida*, supra, 560 U.S. 59; see also *Kennedy* v. *Louisiana*, 554 U.S. 407, 438, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008) (nonhomicide offenders); *Roper* v. *Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (juvenile offenders); *Atkins* v. *Virginia*, 536 U.S. 304, 318, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (offenders with limited intellectual functioning). For juvenile offenders, however, the court extended categorical challenges to apply to sentences of life imprisonment without parole in certain contexts.

*Graham* v. *Florida*, supra, 61. It first banned all sentences of life without parole for juvenile nonhomicide offenders; id., 82; and then the mandatory imposition of sentences of life without parole for juvenile homicide offenders. *Miller* v. *Alabama*, supra, 567 U.S. 465.

*Miller*, in particular, justified the extension of the categorical approach for two reasons, both of which relate to the irrevocability of a life-without-parole punishment. First, the court stated that traditional penological justifications could not warrant a mandatory, irrevocable punishment for a juvenile. Id., 472. Most relevant here, if a sentencing court determines that an offender is incapable of change, then incapacitation and the impossibility of rehabilitation justify his permanent imprisonment. See id., 472–73. But, the court noted, this determination is fundamentally "at odds with a child's capacity for change," so it presents a contradiction when applied to juvenile offenders. Id., 473; see also id., 472–73 ("[d]eciding that a juvenile offender forever will be a danger to society would require mak[ing] a judgment that [he] is incorrigible—but incorrigibility is inconsistent with youth" [internal quotation marks omitted]).

Second, the court "liken[ed] life-without-parole sentences imposed on juveniles to the death penalty itself." Id., 474. The two "share some characteristics . . . that are shared by no other sentences," such as irrevocability by "[i]mprisoning an offender until he dies . . . ." (Internal quotation marks omitted.) Id., 474–75. The comparison is even more apt in the juvenile context: a life-without-parole sentence is "especially harsh" for juveniles "because [a juvenile offender] will almost inevitably serve more years and a greater percentage of his life in prison than an adult offender." (Internal quotation marks omitted.) Id., 475. Moreover, life imprisonment without parole is the "harshest possible penalty" available for a juvenile, after *Roper* barred capital punishment for juveniles. Id., 479. Therefore, the court "treated [life imprisonment without parole] similarly to that most severe punishment" by adopting "a distinctive set of legal rules" that had been applied only in death penalty cases. Id., 475. These rules required individualized sentencing, thereby ensuring that the most severe punishments were not inevitable but were "reserved only for the most culpable [juvenile] defendants committing the most serious offenses." Id., 476.

But when a juvenile is eligible for parole, the punishment is no longer irrevocable, and, therefore, these rationales no longer apply (or, at least, not nearly with as much force). The first reason collapses if state law permits a juvenile to become parole eligible because the punishment expressly acknowledges that the offender might one day change and reenter society. Similarly, the justification for individualized sentencing—the harsh-

ness of a life sentence without parole, which will often mean a much longer period of incarceration than an adult will have with the same sentence—weakens considerably when state law provides an offender the chance for early release. A punishment with the possibility of parole is surely less harsh than one without it.

Not only was *Miller*'s reasoning limited to sentences that do not include parole eligibility, but its holding was as well. Id., 479 ("[w]e therefore hold that the [e]ighth [a]mendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders"). In *Montgomery*, the court took the opportunity to reiterate that life-with-parole sentences were constitutional, as it expressly permitted states to remedy *Miller* violations with parole eligibility. "Allowing those offenders [sentenced in violation of *Miller*] to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence . . . . The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736.

In sum, the United States Supreme Court's juvenile sentencing cases rest as much on the diminished moral culpability and enhanced capacity for rehabilitation of a juvenile offender as on the irrevocability of a punishment of death or life imprisonment without parole. To dismiss the effect of parole eligibility—which makes a punishment less severe by affording the opportunity to demonstrate change—would undercut their reasoning entirely.

2

Connecticut Constitutional Text and History

Textually, article first, §§ 8 and 9, of the state constitution establish principles of due process and serve as the basis for Connecticut's prohibition against cruel and unusual punishments but provide no insight into *Miller*. See *State* v. *Santiago*, supra, 318 Conn. 16 ("the constitution of Connecticut prohibits cruel and unusual punishments under the auspices of the dual due process provisions contained in article first, §§ 8 and 9"). The defendant does not contend, and we have not held, that the text of these provisions of Connecticut's constitution itself, compared with the text of the federal constitution, suggests any enhanced protection under the state constitution. Moreover, although neither due process provision expressly differentiates between juveniles and adults, we draw no conclusion from the fact that "the framers of the 1818 constitution decided to embed these traditional [freedoms from cruel and unusual punishments] in our dual due process clauses . . . rather than in an express punishments clause."

(Citation omitted.) Id., 39.

Neither does Connecticut's constitutional history support the defendant's argument. In the early 1800s, Connecticut accounted for the differences between juvenile and adult offenders, but in ways plainly distinguishable from *Miller*.

One seminal distinction was the availability of the infancy defense: an offender less than seven years of age was conclusively presumed incapable of committing a crime, whereas an offender between the ages of seven and fourteen was presumed incapable, but the presumption was rebuttable. Offenders older than fourteen were treated as adults. *In re Tyvonne M.*, 211 Conn. 151, 156, 558 A.2d 661 (1989). Other distinctions were less formal. Legislative pardons for juveniles were inconsistent but not uncommon; N. Steenburg, Children and the Criminal Law in Connecticut, 1635–1855: Changing Perceptions of Childhood (2005) p. 189 (from 1810 to 1830, General Assembly granted nine of twenty petitions for clemency by juvenile offenders, which was a higher percentage than granted to adult offenders); see also A. Kean, "The History of the Criminal Liability of Children," 53 Law. Q. Rev. 364, 364–66 (1937) (discussing common-law recognition in England as early as thirteenth century of lesser moral culpability of child offenders and development of tendency to pardon them); and juries even may have hesitated to find juveniles guilty during this era. See N. Steenburg, supra, p. 31 ("[t]he General Assembly heard reports that underage criminals were aware that juries did not want to send them to the state prison"). Eventually, juveniles began to receive special treatment in criminal proceedings beyond the infancy defense, such as the appointment of guardians. Id., pp. 23–24, 186–87. By 1843, the legislature had enacted a discretionary sentencing scheme allowing courts to send offenders under age seventeen to less harsh county facilities instead of the state run prisons mandated for adult offenders. Id., p. 200; see Public Acts 1843, c. 21. And, in 1851, it established a separate reform school to house offenders under age sixteen. N. Steenburg, supra, pp. 204–205; see Public Acts 1851, c. 46.

But these protections did not always apply. The laws in place to protect juveniles at the time of ratification were inconsistently followed in practice. See, e.g., N. Steenburg, supra, p. 192 ("the use of . . . guardians was inconsistent and often ineffective"). And the most significant reforms—discretionary sentencing and a reform school—occurred well after the state constitution had been adopted. Even then, although the location where an offender would serve his sentence could be modified, the duration could not: "Because state sentencing guidelines did not specifically allow consideration of mitigating circumstances, many children served what appeared to be excessively harsh sentences . . .

for crimes of youthful disobedience or heedlessness. Judges often had no choice in assigning jail or prison sentences because the General Assembly mandated specific sentences for many crimes." Id., pp. 31–32. This meant juveniles often received the same criminal punishments as adults, including life imprisonment at the state's most notorious prison, Newgate, and even death. See W. Bailey, Children Before the Courts in Connecticut (1918) p. 19 ("it was legally possible for a boy barely over [seven] years of age to be committed to Newgate for life"); 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 368 ("[a] boy of eight years of age, has been executed for burning two barns"); V. Streib & L. Sametz, "Executing Female Juveniles," 22 Conn. L. Rev. 3, 13–15 (1989) (describing execution of twelve year old girl in 1786).

Thus, although Connecticut historically acknowledged that juvenile offenders are different from their adult counterparts and developed measures to allow courts to account for the disparity, the measures Connecticut has used are distinguishable from the one required by *Miller*. In the early 1800s, juvenile status appeared to end at an offender's fourteenth birthday. When protections were technically available, they were discretionary, inconsistently applied, or both. And when protections were actually invoked, most addressed criminal liability (e.g., the infancy defense) or criminal procedure (e.g., the appointment of guardians), but not criminal punishment. Even the state's later sentence mitigation reforms were merely permissive and only allowed a court to change the location where a defendant would serve a sentence. Mandatory consideration of age and the hallmarks of adolescence prior to imposing certain punishments on juvenile offenders is a much more recent development. Therefore, Connecticut constitutional history does not support the defendant's argument that only resentencing, and not parole eligibility, can remedy a *Miller* violation.

3

Connecticut Precedent

This court has not yet addressed *Miller* as a matter of substantive state law. Our prior decisions on the subject have been limited to procedural state law and federal law. We, therefore, consider these cases as persuasive precedent but conclude that they do not support a rule that requires resentencing for punishments that include parole eligibility.

*Casiano* is the only case in which we have addressed cruel and unusual punishment as it relates specifically to juveniles under state law, as opposed to federal law. In that case, we concluded that *Miller* was a watershed rule of criminal procedure, and, therefore, it applied retroactively to cases arising on collateral review. *Casiano* v. *Commissioner of Correction*, supra, 317 Conn.

69, 71. As the defendant notes, we stated broadly that consideration of the *Miller* factors in sentencing was "implicit in the concept of ordered liberty" and "central to an accurate determination that the sentence imposed is a proportionate one." (Internal quotation marks omitted.) Id., 69. But our interpretation of *Miller* was clearly more limited. We recognized that *Miller* "set forth a presumption that a juvenile offender would not receive a life sentence without parole"; id., 70; and repeatedly recognized that the rule was limited to that "particular punishment." Id., 71.

As a matter of federal law, this court expressly and recently has held that parole eligibility is an adequate remedy for a *Miller* violation. In *State* v. *Delgado*, supra, 323 Conn. 810, the defendant originally had been sentenced without consideration of the *Miller* factors to the functional equivalent of life imprisonment without parole. With the enactment of P.A. 15-84, § 1, however, he became parole eligible. Id. We held that this remedied the constitutional violation: "[U]nder *Miller*, a sentencing court's obligation to consider youth related mitigating factors is limited to cases in which the court imposes a sentence of life, or its equivalent, without parole. . . . As a result [of P.A. 15-84, § 1], the defendant's sentence no longer falls within the purview of *Miller*, *Riley* and *Casiano*, which require consideration of youth related mitigating factors only if the sentencing court imposes a sentence of life *without* parole. . . . *Miller* simply does not apply when a juvenile's sentence provides an opportunity for parole . . . ." (Citations omitted; emphasis altered.) Id., 811; see also part II of this opinion.

This court also has stated more broadly that *Miller* does not apply to sentences that "lack the severity of the sentences at issue in *Roper*, *Graham* and *Miller*." *State* v. *Taylor G.*, 315 Conn. 734, 744–45, 110 A.3d 338 (2015). In *Taylor G.*, we concluded that a juvenile offender's mandatory total effective sentence of ten years of incarceration followed by three years of special parole did not violate *Miller*. The court emphasized that the punishment was "far less severe" than those at issue in the United States Supreme Court's juvenile punishment cases because it was not "final and irrevocable . . . ." Id. We stated: "Although the deprivation of [a juvenile's] liberty for any amount of time, including a single year, is not insignificant, *Roper*, *Graham* and *Miller* cannot be read to mean that all mandatory deprivations of liberty are of potentially constitutional magnitude." Id., 745.[6]

The defendant notes that this court has twice—in *Riley* and *Casiano*—interpreted *Miller* to apply to punishments that it does not expressly include. Although these cases reflect this court's determination that the phrase "life imprisonment without parole" should be construed beyond its literal meaning, we have applied

*Miller* only to punishments that have a substantially similar practical effect. Thus, the punishments at issue in *Riley* and *Casiano* are distinguishable from punishments that include parole eligibility under P.A. 15-84, § 1.

In the first case, *State* v. *Riley*, supra, 315 Conn. 637, in which we reasoned that *Miller* "logically reaches beyond its core holding," we concluded that it applied to discretionary sentences and to sentences for terms of years that were the "functional equivalent" of a sentence of life without parole. Id., 642, 654. But many of the reasons we cited for why *Miller* should apply to these types of punishments do not apply when the juvenile is parole eligible. For example, we relied on the fact that the defendant's sentence of 100 years imprisonment with the possibility of parole after ninety-four years left him "no possibility of parole before his natural life expires" and ensured that he "would undoubtedly die in prison . . . ." Id., 640, 643 n.2, 660. Parole eligibility after thirty years under P.A. 15-84, § 1, however, contemplates release when most juvenile offenders will be in their late forties, thereby offering a realistic opportunity for a life outside of prison.

Similarly, in *Casiano*, apart from the retroactivity holding described previously, we held that *Miller* applied to a sentence of fifty years imprisonment without the possibility of parole. *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 79. Although we stated that "the concept of 'life' in *Miller* and *Graham* [was] more [broad] than biological survival"; id., 78; we were ultimately concerned with "the sense of hopelessness" that accompanies a life-without-parole sentence, which "means that good behavior and character improvement are immaterial . . . ." (Internal quotation marks omitted.) Id., 78–79, quoting *Graham* v. *Florida*, supra, 560 U.S. 70. Conversely, parole eligibility offers hope and makes an offender's future conduct relevant.[7]

Thus, Connecticut precedent indicates only that this court has been willing to interpret *Miller* beyond its literal meaning, but not so far as to require resentencing for punishments that include parole eligibility under P.A. 15-84, § 1.

4

Sibling State Precedent

The defendant argues that sibling state comparisons are not helpful in our analysis because certain aspects of Connecticut's juvenile punishment scheme—most notably, a parole system in which eligibility is based in part on the length of the sentence—are unique to this state. Although Connecticut's parole system appears to be distinct in this respect, we note that our essential holding in *Delgado* that *Miller* does not require resentencing for a punishment that includes parole eligibility is consistent with other jurisdictions. See *State* v. *Delgado*, supra, 323 Conn. 811–12 n.7 (citing jurisdictions);

see also, e.g., *Talbert* v. *State*, No. 64486, 2016 WL 562778, *1 (Nev. February 10, 2016) (parole eligibility "within [offender's] lifetime"); *State* v. *Charles*, 892 N.W.2d 915, 920–21 (S.D.) (parole eligibility at age sixty), cert. denied,     U.S.    , 138 S. Ct. 407, 199 L. Ed. 2d 299 (2017). Similarly, other jurisdictions have held that their state constitutions do not require a court to consider the *Miller* factors before imposing a punishment that includes parole eligibility. E.g., *State* v. *Propps*, 897 N.W.2d 91, 102 (Iowa 2017) (punishment including "realistic and meaningful" parole eligibility); *Diatchenko* v. *District Attorney*, 466 Mass. 655, 673, 1 N.E.3d 270 (2013) (life imprisonment with possibility of parole after thirty-one years); *State* v. *Vang*, 847 N.W.2d 248, 262–63 (Minn. 2014) (life imprisonment with possibility of early release after thirty years).

5

Public Policy

Nor does Connecticut's public policy compel a conclusion that resentencing is the sole remedy for a *Miller* violation. "[O]ur legislature  .  .  .  has the primary responsibility for formulating the public policy of our state." *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 435. In both *Riley* and *Casiano*, this court declined to address issues related to the recent constitutional developments in juvenile punishment in deference to the legislature. See *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 79 ("we have every reason to expect that our decisions in *Riley* and in the present case will prompt our legislature to renew earlier efforts to address the implications of . . . *Graham* and *Miller*"); *State* v. *Riley*, supra, 315 Conn. 662 ("there is every reason to believe that the legislature will take definitive action regarding these issues").

In response, the legislature passed P.A. 15-84. See Proposed Senate Bill No. 796, 2015 Sess. ("Statement of Purpose: [t]o comply with the decisions of the Supreme Court of the United States in *Miller* v. *Alabama* [supra, 567 U.S. 460] and *Graham* v. *Florida* [supra, 560 U.S. 48]"). Section 2 of P.A. 15-84, in relevant part, requires a court to consider the *Miller* factors when imposing certain sentences upon juvenile offenders. The legislature determined, however, that this requirement would not be retroactive. See *State* v. *Delgado*, supra, 323 Conn. 814 and n.9. Therefore, it does not apply to the defendant. Section 1 of P.A. 15-84, however, does apply to him and does provide a remedy. As set forth previously, the legislature provided retroactive parole eligibility to juvenile offenders sentenced to more than ten years in prison.

The defendant and amici cite abundant evidence of the differences between juveniles and adults, which they contend weighs in favor of requiring consideration of the *Miller* factors at sentencing, even retrospectively

and in addition to parole eligibility.[8] We are not per-suaded. First, our legislature considered this perspec-tive alongside other evidence that weighed against a broader application of P.A. 15-84, § 2, such as public safety,[9] the impact on victims,[10] and feasibility.[11] Second, more broadly, we have recognized that certain policy based aspects of criminal punishment are best left to the legislature. See, e.g., *State* v. *Bell*, 303 Conn. 246, 267, 33 A.3d 167 (2011) ("to the extent that the economic costs of incarceration are a factor in determining an appropriate sentence, they are to be considered not by the sentencing authority but by the legislature when it is enacting sentencing provisions"); see also part II B of this opinion. Third, legislatures from other jurisdictions also have chosen to remedy *Miller* violations with parole eligibility. E.g., Cal. Penal Code § 3051 (b) (4) (Deering Supp. 2018); Nev. Rev. Stat. §§ 176.025 and 213.12135 (2017); Tex. Penal Code Ann. § 12.31 (a) (West 2013); Wyo. Stat. Ann. § 6-10-301 (c) (2013).

Fourth, and finally, both a belated resentencing hear-ing and a parole hearing can provide a meaningful rem-edy to this newly declared constitutional violation, although neither is ideal. "Under *Miller*, bear in mind, the inquiry is whether the inmate was seen to be incorri-gible when he was sentenced—not whether he has proven corrigible and so can safely be paroled today." *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 744 (Scalia, J., dissenting). As with any factual issue, the passage of time often makes this finding difficult. "For example, [if the defendant waived a presentence investigation report at his original sentencing], a resentencing court would be called on to determine, without the benefit of a presentence investigation conducted at the time of the defendant's conviction, what the defendant's character was . . . years ago when he was sentenced. Without such information, the court would likely need to principally rely upon the defendant's subsequent rehabilitation or lack thereof since his sentencing. . . . Resentencing in such cases would be cumbersome and would in reality be more akin to a parole hearing." *State* v. *Williams-Bey*, 167 Conn. App. 744, 778–79, 144 A.3d 467 (2016), modified in part on other grounds, 173 Conn. App. 64, 164 A.3d 31 (2017), aff'd, 333 Conn. 468, A.3d (2019). The same situation arises in the present case because the parties cannot locate the presentence investigation report authored for the defendant's origi-nal sentencing in 2003. Although it is "not impossible"; *Songster* v. *Beard*, 201 F. Supp. 3d 639, 641 (E.D. Pa. 2016); even in cases in which only a few years have passed, "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irrepara-ble corruption." (Internal quotation marks omitted.) *Graham* v. *Florida*, supra, 560 U.S. 68. Asking sentenc-ing judges to make this determination years after the

fact might, in these cases, be asking too much.

The parole board, under P.A. 15-84, § 1, on the other hand, bases its decisions on more recent evidence and more ascertainable outcomes. Although parole and resentencing hearings share many of the same characteristics—e.g., the right to counsel, the offender's right to make a statement and present evidence, each victim's right to make a statement, the availability of expert testimony—the parole board relies more on evidence of actual rehabilitation and focuses more on the offender's ability to succeed outside of prison at the most relevant moment, just before he will, potentially, be released. For example, it considers the probability that he will "remain at liberty without violating the law," the continuing "benefits to [the offender] and society that would result from [the offender's] release," and the offender's "substantial rehabilitation . . . ." P.A. 15-84, § 1, codified at General Statutes (Supp. 2016) § 54-125a (f) (4). It does not overlook the value of the *Miller* factors, though. Alongside these forward-looking factors described previously, the board also considers a juvenile offender's "age and circumstances . . . as of the date of the commission of the crime," "remorse and increased maturity since the date of the commission of the crime," and "efforts to overcome . . . obstacles that such person may have faced as a child . . . ." General Statutes (Supp. 2016) § 54-125a (f) (4).[12] It considers not whether a juvenile is capable of change in the distant future but, rather, from the best possible vantage point, whether he has actually changed.

These considerations highlight a truth about the retroactive application of *Miller* that appears to animate the dissent and its frustration with our decisions in this case and in *Delgado*—that no remedy will put the defendant in the same position he would have been in if his youth had been considered when he was sentenced. In the present case, the defendant was effectively sentenced to life imprisonment, and state law did not provide an opportunity for parole for such crimes. See footnote 17 of this opinion. A sentence of life without parole improperly denies the juvenile offender of "a chance to demonstrate growth and maturity" because the court's judgment that he is "incorrigible" "was made at the outset," before he had the opportunity to show any capacity for change. (Internal quotation marks omitted.) *State* v. *Riley*, supra, 315 Conn. 648, quoting *Graham* v. *Florida*, supra, 560 U.S. 73. Without the possibility of parole, the defendant was denied hope; *Graham* v. *Florida*, supra, 70; and had no incentive to "demonstrate growth and maturity" that he might use in support of a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (Internal quotation marks omitted.) *State* v. *Riley*, supra, 648.

Neither the remedy this state provides (parole eligi-

bility), which *Montgomery* has held to be constitutionally sufficient, nor the dissent's proposed remedy of resentencing can reinstate to the defendant the opportunities for demonstrated growth that he lost during those years. That is not to say that resentencing is not a meaningful, practical, and constitutionally sufficient remedy. All we are saying is that parole eligibility also is a meaningful, practical, and constitutionally sufficient remedy in light of the fact that no remedy can travel back in time and provide the defendant with a *Miller* compliant sentencing hearing at the time of his original sentencing. No one has lost their courage, shrugged their shoulders, or not tried to remedy the constitutional violation at issue. Rather, the legislature, this court in *Delgado*, and the United States Supreme Court in *Montgomery* recognized that remedying this violation is not as simple as recalculating a sentence on the basis of retroactive changes to sentencing guidelines or vacating a sentence enhancement that has been deemed unconstitutionally vague, analogies that the dissent finds apt. Unlike those circumstances, the remedy of resentencing in this case is an incomplete remedy. The legislature chose to rectify this problem by providing juvenile defendants with the possibility of parole, a meaningful remedy consistent with *Miller* that "ensures that juveniles whose crime reflected only transient immaturity— and who have since matured—will not be forced to serve a disproportionate sentence." *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736.

We acknowledge that a defendant's parole eligibility date under P.A. 15-84, § 1, is determined by the length of his original sentence, which, in some cases, was imposed without consideration of the *Miller* factors. See P.A. 15-84, § 1, codified at General Statutes (Supp. 2016) § 54-125a (f) (1) (juvenile offender parole eligible [A] "if such person is serving a sentence of [between ten and fifty years] . . . after serving sixty per cent of the sentence or twelve years, whichever is greater, or [B] if such person is serving a sentence of more than fifty years . . . after serving thirty years"). But this alone does not completely nullify the significance of parole eligibility under P.A. 15-84, § 1. See *Graham* v. *Florida*, supra, 560 U.S. 75 ("[a] [s]tate is not required to guarantee eventual freedom to a juvenile offender"). It still offers a meaningful opportunity to "demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736.

Ultimately, we do not believe that we are better situated than the legislature to strike an appropriate balance among these competing policies, particularly in an area that is traditionally within the purview of the legislature and when we have called the legislature's attention to these specific issues. Therefore, we do not conclude that the considerations identified by the defendant and the amici compel a particular constitu-

tional rule beyond what the legislature requires.

B

The preceding *Geisler* analysis informs our application of the substantive legal test under our state constitution. See *State* v. *Santiago*, supra, 318 Conn. 18–19 n.14. ("our consideration of the relevant *Geisler* factors is interwoven into our application of the legal framework that properly governs such challenges"). "[T]he constitution of Connecticut prohibits cruel and unusual punishments under the auspices of the dual due process provisions contained in article first, §§ 8 and 9." Id., 16. In evaluating challenges under this prohibition, we apply the two part federal framework that we adopted in *State* v. *Ross*, 230 Conn. 183, 252, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). *State* v. *Santiago*, supra, 19, 21. First, we consider "whether the punishment at issue comports with contemporary standards of decency." Id., 21. Second, we also must exercise our independent judgment to determine whether the punishment is constitutional. Id., 22.

In the first part—evolving standards of decency—we look for consensus based on five objective criteria: "(1) the historical development of the punishment at issue; (2) legislative enactments; (3) the current practice of prosecutors and sentencing juries; (4) the laws and practices of other jurisdictions; and (5) the opinions and recommendations of professional associations." Id., 52.

We conclude that it does not categorically offend contemporary standards of decency to remedy a *Miller* violation with parole eligibility. Historically, although Connecticut enacted some measures to permit courts to mitigate punishment of juvenile offenders, the specific protections used were distinguishable from the sentencing practice at issue, limited, and inconsistently applied. See part I A 2 of this opinion. Currently, the prospective-only sentencing provisions in P.A. 15-84, § 2, reflect the reasoned judgment of the legislature, which is a reliable indicator of our public policy. This approach to *Miller* violations is also in accord with that of other jurisdictions. Finally, although a consensus of professional associations[13] agrees that the *Miller* factors are relevant in determining a juvenile offender's culpability and capacity for rehabilitation, we note that P.A. 15-84, § 2, instructs a parole board to consider similar factors, as well as any additional evidence put forth by the offender, in determining whether the offender is entitled to early release.

In the second part of the federal framework—the exercise of independent judgment—we consider judicial precedents and "our own understanding of the rights secured by the constitution," which encompasses "whether the penalty at issue promotes any of the penal goals that courts and commentators have recognized as

legitimate: deterrence, retribution, incapacitation, and rehabilitation." *State* v. *Santiago*, supra, 318 Conn. 22. Although "this court cannot abdicate its nondelegable responsibility for the adjudication of constitutional rights" by giving unwarranted deference to the legislature, "we should exercise our authority with great restraint . . . ." (Internal quotation marks omitted.) Id., 42, quoting *State* v. *Ross*, supra, 230 Conn. 249.

Our independent judgment does not compel a conclusion that a *Miller* violation may not be remedied by parole eligibility under P.A. 15-84, § 1. Like the federal constitution, our state constitution secures the right to proportionality in the punishment of juveniles. In analyzing proportionality, the characteristics of the offender must be balanced against the severity of the punishment. Thus, in juvenile sentencing cases, courts have emphasized the severity of the sentences at issue —death and life without parole—as much as the diminished culpability and greater capacity for reform of juvenile offenders. Moreover, as distinguished from sentences of death and life without parole, sentences contemplating early release do not necessarily negate all penological justification. Incapacitation and rehabilitation may continue to justify sentences with parole eligibility because they account for the fact that juveniles can change.

For the previously stated reasons, we conclude that parole eligibility afforded by P.A. 15-84, § 1, is an adequate remedy for a *Miller* violation under the Connecticut constitution.

## II

In *State* v. *Delgado*, supra, 323 Conn. 801, we held that in light of P.A. 15-84, which provided juvenile offenders with the possibility of parole, *Miller* no longer applied because it did not apply to juvenile offenders who are serving a sentence of life imprisonment, or its equivalent, as long as those offenders have the possibility of parole. Id., 811; see also *State* v. *Boyd*, 323 Conn. 816, 151 A.3d 355 (2016) (companion case to *Delgado* decided on same grounds). The defendant claims that this court should overrule *Delgado* because it renders P.A. 15-84, § 1, unconstitutional under the separation of powers doctrine embodied in the state constitution and under the due process clause of the federal constitution. See footnote 15 of this opinion. Addressing these arguments now, we are not persuaded by them.

## A

In *Delgado*, the defendant originally was serving a sentence of sixty-five years in prison, "which is equivalent to life imprisonment," and was not eligible for parole. *State* v. *Delgado*, supra, 323 Conn. 810. Because the sentencing court had not considered the *Miller* factors, the defendant filed a motion to correct an illegal sentence, asserting a *Miller* claim under the federal

constitution. Id., 803–805. In that motion, he claimed he was entitled to resentencing, despite the subsequent passage of P.A. 15-84, § 1, which afforded him the possibility of parole. Id., 803–804.

This court disagreed. It reasoned that because of P.A. 15-84, § 1, the defendant "can no longer claim that he is serving a sentence of life imprisonment, or its equivalent, without parole. The eighth amendment, as interpreted by *Miller*, does not prohibit a court from imposing a sentence of life imprisonment with the opportunity for parole for a juvenile homicide offender, nor does it require the court to consider the mitigating factors of youth before imposing such a sentence. . . . Rather, under *Miller*, a sentencing court's obligation to consider youth related mitigating factors is limited to cases in which the court imposes a sentence of life, or its equivalent, without parole. . . . As a result, the defendant's sentence *no longer falls within the purview of Miller*, *Riley* and *Casiano*, which require consideration of youth related mitigating factors only if the sentencing court imposes a sentence of life without parole. . . . *Miller simply does not apply* when a juvenile's sentence provides an opportunity for parole . . . ." (Citations omitted; emphasis altered.) Id., 810–11.

We noted in *Delgado* that our reasoning was consistent with the analysis in *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736, which indicated that states "may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. . . . Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the [e]ighth [a]mendment." (Citation omitted.) Id.

The dissent takes issue with our reliance on *Delgado*, which it contends improperly interpreted *Montgomery* by holding that *Miller* no longer applied once the defendant was granted parole eligibility. The dissent argues that this sidesteps the issue of whether parole eligibility is a sufficient cure for a federal *Miller* violation in light of this court's holding in *Casiano* that the rule in *Miller* is a watershed rule of criminal procedure. The dissent essentially would have us overrule *Delgado* on this ground.[14] The dissent argues further that *Delgado* is distinguishable on the ground that it "neither addresses nor answers the different question raised by defendant here, which is whether the availability of parole under P.A. 15-84 cures a constitutional violation that this court [in *Casiano*] has deemed to be a 'watershed' rule—that is, a rule essential to the fundamental fairness of the judicial proceeding, central to an accurate determination of a proportionate sentence, and implicit in the very idea of ordered liberty—as a matter of state postconviction, remedial law." (Emphasis omitted.)

The defendant never has advanced any of the dissent's arguments, however.[15] Moreover, the arguments the dissent raises not only implicate whether *Delgado* should be overruled, but also call into question the continued vitality of *Casiano* and the proper application of the framework set forth in *Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), after the United States Supreme Court subsequently held in *Montgomery* that the rule in *Miller* was a matter of "substantive" law.[16] *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736. Because the parties do not address these issues, and in light of the unique nature of *Casiano*—the only case to hold that *Miller* is a watershed rule of criminal procedure, a unique designation in of itself, and a linchpin of the dissent's analysis—this court has been provided with little guidance on how to address these issues. It is precisely for this reason that we do not decide cases based on issues not raised by the parties. See, e.g., *State* v. *Connor*, 321 Conn. 350, 362, 138 A.3d 265 (2016).

Additionally, when no party has asked us to overrule precedent, we are particularly reluctant to address—much less disturb—a unanimous precedent of recent vintage; see, e.g., *New England Estates, LLC* v. *Branford*, 294 Conn. 817, 836 n.20, 988 A.2d 229 (2010) (declining to overrule precedent when not argued by parties); when the legislative response to *Miller* at issue was invited by this court; see *State* v. *Casiano*, supra, 317 Conn. 79 ("we have every reason to expect that our decisions in *Riley* and in the present case will prompt our legislature to renew earlier efforts to address the implications of the Supreme Court's decisions in *Graham* and *Miller*"); and the precedent is consistent with the United States Supreme Court's holding that parole eligibility is a sufficient remedy for a *Miller* violation. See *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736. We would reexamine such a precedent only when there is a "special justification . . . ." *Sepega* v. *DeLaura*, 326 Conn. 788, 799 n.5, 167 A.3d 916 (2017). The dissent's views do not present such a justification.

B

With respect to the claims actually raised by the defendant, he requests that we overrule our holding in *Delgado* because, otherwise, in his view, it effectively renders P.A. 15-84, § 1, unconstitutional by violating the separation of powers doctrine embodied in article second of the Connecticut constitution, as amended by article eighteen of the amendments. See footnote 5 of this opinion. According to the defendant, *Delgado* holds that his unconstitutional punishment is cured by P.A. 15-84, § 1, because it provides him with a future parole hearing, at which a panel of the Board of Pardons and Paroles will consider the *Miller* factors. He argues that the legislature overstepped and encroached upon the

power of the judiciary by changing the defendant's sentence to include the possibility of parole and by delegating resentencing power to the board because sentencing is solely within the power of the judiciary.

Our holding in *Delgado*, however, was not that P.A. 15-84, § 1, *cures* a *Miller* violation. Rather, more accurately, parole eligibility under P.A. 15-84, § 1, *negates* a *Miller* violation because the sentence no longer falls within the purview of *Miller*. Resentencing would undoubtedly cure a *Miller* violation. See *State* v. *Delgado*, supra, 323 Conn. 810–11. But, although a particular defendant's sentence is not actually changed per court order, P.A. 15-84, § 1, has the legal effect of altering the defendant's punishment so that he no longer will serve life, or its equivalent, in prison without the possibility of parole. And, as we said in *Delgado*, if a defendant has the possibility of parole, there is no *Miller* violation. Id. Thus, resentencing is not required. Id. A punishment that includes parole eligibility "no longer falls within the purview of *Miller* . . . . *Miller* simply does not apply when a juvenile's sentence provides an opportunity for parole . . . ." (Citations omitted.) Id., 811. As we have more recently stated, "we understand *Delgado* to be, in essence, a mootness decision . . . ." *State* v. *Evans*, 329 Conn. 770, 788 n.16, 189 A.3d 1184 (2018), cert. denied,      U.S.     , 139 S. Ct. 1304, 203 L. Ed. 2d 425 (2019). It is with this understanding that we address the defendant's separation of powers argument, which does not persuade us.

"[B]ecause a validly enacted statute carries with it a strong presumption of constitutionality, those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . [W]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) Id., 809.

Article second of the constitution of Connecticut, as amended by article eighteen of the amendments, provides in relevant part: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. . . ." Conn. Const., amend XVIII. "[T]he primary purpose of [the separation of powers] doctrine is to prevent commingling of different powers of government in the same hands. . . . The constitution achieves this purpose by prescribing limitations and duties for each branch that are essential to each branch's independence and performance of assigned powers." (Internal quotation marks omitted.) *State* v. *Evans*, supra, 329 Conn. 810. Nevertheless, "[t]he rule of separation of governmental powers cannot always

be rigidly applied." (Internal quotation marks omitted.) *Adams* v. *Rubinow*, 157 Conn. 150, 155, 251 A.2d 49 (1968). Our state government is not "divided in any such way that all acts of the nature of the functions of one department can never be exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government." *In re Application of Clark*, 65 Conn. 17, 38, 31 A. 522 (1894).

In challenges to a statute's constitutionality on the ground that it impermissibly infringes on the judicial authority in violation of separation of powers principles, "[a] statute will be held unconstitutional on [separation of powers] grounds [only] if: (1) it governs subject matter that not only falls within the judicial power, but also lies exclusively within judicial control; or (2) it significantly interferes with the orderly functioning of the Superior Court's judicial role." (Internal quotation marks omitted.) *State* v. *Evans*, supra, 329 Conn. 810.

1

The defendant first argues that the legislature impermissibly modified his sentence by providing him with parole eligibility. He argues that, insofar as the judiciary has the exclusive power to modify a judgment, it also has the exclusive power to modify a sentence because a sentence is "the pronouncement of judgment in criminal cases . . . ." This argument is unpersuasive for two reasons.

First, under our state's law, the power of sentencing is a shared power. Although the judiciary exclusively has the power to render, open, vacate, or modify a judgment, we repeatedly have held that the power to sentence is shared by all three branches of government. See, e.g., *Washington* v. *Commissioner of Correction*, 287 Conn. 792, 828, 950 A.2d 1220 (2008) ("[a]lthough the judiciary unquestionably has power over criminal sentencing . . . the judiciary *does not have exclusive authority in that area*" [emphasis in original; internal quotation marks omitted]); id. (legislature decides appropriate penalties, judiciary adjudicates and determines sentence, and executive manages parole system); *State* v. *Campbell*, 224 Conn. 168, 178, 617 A.2d 889 (1992) ("sentencing is not within the exclusive control of the judiciary and . . . there is no constitutional requirement that courts be given discretion in imposing sentences"), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993). The judiciary may impose a specific sentence, but the legislature has the power to define crimes, prescribe punishments for crimes, impose mandatory minimum terms of imprisonment for certain crimes, preclude the probation or suspension of a sentence, and even pardon offenders. See *State* v. *Darden*, 171 Conn. 677, 679–80, 372 A.2d 99 (1976) ("the constitution assigns to the legislature the power to

enact laws defining crimes and fixing the degree and method of punishment and to the judiciary the power to try offenses under these laws and impose punishment within the limits and according to the methods therein provided"); *State* v. *Morrison*, 39 Conn. App. 632, 634, 665 A.2d 1372 ("Prescribing punishments for crimes . . . is . . . a function of the legislature. . . . The judiciary's power to impose specific types of sentences is therefore defined by the legislature." [Citations omitted; internal quotation marks omitted.]), cert. denied, 235 Conn. 939, 668 A.2d 376 (1995); see also *McLaughlin* v. *Bronson*, 206 Conn. 267, 271, 537 A.2d 1004 (1988) ("Ordinarily, the pardoning power resides in the executive. . . . In Connecticut, the pardoning power is vested in the legislature . . . ." [Citations omitted.]). It is the legislature that defines the parameters of a sentencing scheme, including whether it permits parole eligibility.[17] See *Mead* v. *Commissioner of Correction*, 282 Conn. 317, 324, 920 A.2d 301 (2007) ("eligibility for parole [is] a part of the state's sentencing scheme"). That is what the legislature did in enacting P.A. 15-84, § 1.[18]

Second, the power to impose or modify a judgment of conviction is not synonymous with the power of sentencing. A judgment of conviction is defined as "[t]he written record of a criminal judgment, consisting of the plea, the verdict or findings, the adjudication, and the sentence." Black's Law Dictionary (10th Ed. 2014) p. 972. "Sentencing," however, is defined as "[t]he judicial determination of the penalty for a crime." Id., p. 1570; see id., p. 1569 (defining "sentence" as "the punishment imposed on a criminal wrongdoer"). Public Act 15-84, § 1, does not alter the defendant's judgment of conviction. He remains convicted of murder, conspiracy to commit murder, and assault in the first degree. In enacting P.A. 15-84, § 1, the legislature retroactively modified the sentencing scheme (although not any particular sentence), which is included in its power to prescribe and limit punishments for crimes.[19]

The defendant counters that, although the legislature has the power to create the scheme of punishment, it cannot do so retroactively without violating the separation of powers doctrine because the change effectively modifies his sentence. But the fact that the legislature, in exercising its power to create and modify the state's sentencing scheme, has affected a particular defendant's sentence does not mean that it has impermissibly encroached upon the judiciary's powers to impose or modify a sentence. It is well established that judicial and legislative powers necessarily overlap in many areas, including sentencing. See, e.g., *State* v. *Campbell*, supra, 224 Conn. 178 ("[a]lthough the judiciary unquestionably has power over criminal sentencing . . . the judiciary does not have exclusive authority in that area").

The fact that certain governmental powers overlap

is not only necessary to ensure the smooth and effective operation of government; see *In re Application of Clark*, supra, 65 Conn. 38 (rigid application of separation of powers doctrine would "result in the paralysis of government"); but also is a product of the historical evolution of Connecticut's governmental system, which established a "tradition of harmony" among the separate branches of government that the separate branches of the federal governmental system did not have. R. Kay, "The Rule-Making Authority and Separation of Powers in Connecticut," 8 Conn. L. Rev. 1, 7 (1975). As it relates to the Judicial Branch, this tradition might be explained in part by the fact that, before the constitution of 1818, Connecticut did not have a separate judicial system. Rather, the executive and legislative branches shared judicial power, with the governor sitting on the five judge panel of the Superior Court and the General Assembly having the power of final review over decisions. W. Horton, The History of the Connecticut Supreme Court (West 2008) pp. 9–12.

Nor was a strict separation of powers enshrined in the state constitution. Although delegates adopted the provision currently contained in article second, they rejected another provision that would have barred one branch of government from exercising the powers of another:[20] "[T]he [1818 state constitutional] convention [did] not seem to have been interested either in a particularly stringent version of separation of powers or in a careful restriction of the powers of the legislature. The convention struck the provision that would have expressly prohibited the officers of each department from exercising powers properly classified as belonging to another. Such explicit provisions were common in constitutions of other states being written at this time. . . . Given [the] tradition of harmony between executive and legislative departments, it may be that the convention did not feel the necessity for a strict expression of separation of powers. . . . The 1818 Constitution thus established a government with a flexible separation of powers and a distinctly dominant legislative branch." R. Kay, supra, 8 Conn. L. Rev. 7.

"The Connecticut history with regard to separation of powers stands in marked contrast, therefore, to that of the federal [c]onstitution." E. Peters, "Getting Away from the Federal Paradigm: Separation of Powers in State Courts," 81 Minn. L. Rev. 1543, 1552 (1997). "Diverse [state] histories[21] demonstrate that even though state constitutional provisions may textually resemble those found in the federal [c]onstitution, they may reflect distinct state identities that will result in differences in how courts apply and construe such texts. Far from being arbitrary departures from a superior federal model, these interpretations have the legitimacy of differences rooted in the past and adaptable for the future." (Footnote added.) Id., 1553.

This is not to say that one branch cannot unconstitutionally intrude upon the authority of another branch, or has not done so. This court is appropriately vigilant in guarding against such intrusions. See, e.g., *State* v. *McCahill*, 261 Conn. 492, 512, 811 A.2d 667 (2002) (legislative intrusion on judiciary); *Savage* v. *Aronson*, 214 Conn. 256, 269, 571 A.2d 696 (1990) (executive intrusion on judiciary); *Stolberg* v. *Caldwell*, 175 Conn. 586, 604, 402 A.2d 763 (1978) (executive intrusion on legislature), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981); see also *Spiotti* v. *Wolcott*, 326 Conn. 190, 201–202, 163 A.3d 46 (2017) ("[w]hen we construe a statute . . . our only responsibility is to determine what the legislature, within constitutional limits, intended to do" [internal quotation marks omitted]).

In the present circumstances, however, the original constitutional intrusion was not upon another branch, but upon the rights of individuals not to have cruel and unusual punishments imposed upon them. Those punishments, although judicially levied, were legislatively authorized or even, in some cases, mandated. It is hardly incongruous—or unconstitutional—then, for the legislature to be a part of the solution to the intrusion on individual liberty it caused. This seems particularly true when the United States Supreme Court has suggested this very remedy; see *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736; and when we have invited the legislature to take such action. See *State* v. *Riley*, supra, 315 Conn. 662; see also *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 79.

Accordingly, we conclude that P.A. 15-84, § 1, is not unconstitutional because the legislature did not improperly exceed its authority by providing the defendant with the possibility of parole.[22]

2

The defendant also argues that, in its quest to cure a *Miller* violation via the parole board's future consideration of the *Miller* factors, P.A. 15-84, § 1, violates the separation of powers doctrine by impermissibly delegating sentencing authority to the board. This argument is premised on a misreading of *Delgado* and the act.

To reiterate, in *Delgado*, we held that after passage of P.A. 15-84, § 1, if a sentence includes parole eligibility, it "no longer falls within the purview of *Miller* . . . . *Miller* simply does not apply . . . ." (Citations omitted.) *State* v. *Delgado*, 323 Conn. 811. Thus, as mentioned before, we did not hold in *Delgado* that P.A. 15-84, § 1, cures a *Miller* violation. Rather, more accurately, parole eligibility under P.A. 15-84, § 1, negates a *Miller* violation. As a result, because the defendant is parole eligible under the act, he is not entitled to have the *Miller* factors considered, and, thus, there is no need for resentencing. Therefore, the board's power at the

parole stage is distinct from the judiciary's sentencing power.

Instead, the board has the power to determine whether a parole eligible offender is entitled to parole. This is to ensure that defendants have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham* v. *Florida*, supra, 560 U.S. 75. In furtherance of this goal, the act requires the board to consider certain factors, including the offender's age and circumstances at the time of the offense. But, although these factors echo the *Miller* factors, they are not identical.[23] Even if they were, just because the constitution requires the *Miller* factors to be considered at sentencing going forward does not mean that the legislature may not also require that the board consider those factors at other times.

Therefore, we conclude that P.A. 15-84, § 1, does not violate the separation of powers doctrine by improperly delegating sentencing power to the board.

C

In his reply brief, the defendant also claims that we should overrule *Delgado* because it renders P.A. 15-84, § 1, unconstitutional by violating federal due process requirements. Specifically, he argues that, because the legislature has the power to change or repeal P.A. 15-84, § 1, in the future, he is deprived of due process in light of the rule that " '[s]entences in criminal cases should reveal with fair certainty the intent of the court and exclude any serious misapprehensions by those who must execute them.' *United States* v. *Daugherty*, 269 U.S. 360, 363, 46 S. Ct. 156, 70 L. Ed. 309 (1926)." He argues that his sentence is not fairly certain if the legislature has the power to continually change it.

The defendant's analysis of this claim consists of one short paragraph in his reply brief. He does not provide any case law or analysis beyond his single citation to *Daugherty*. Nor does he specify whether he is making a procedural or substantive due process claim. There is no reference to the interest balancing test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), as required under a procedural due process claim that implicates a liberty interest; see *State* v. *Anderson*, 319 Conn. 288, 314–15, 127 A.3d 100 (2015); or to the rational basis test applied to a substantive due process claim that does not involve a fundamental right. See *State* v. *Moran*, 264 Conn. 593, 615, 825 A.2d 111 (2003).

Because the defendant has not briefed the analytic complexities of his due process claim, we deem it inadequately briefed. See, e.g., *State* v. *Buhl*, 321 Conn. 688, 726–29, 138 A.3d 868 (2016) (upholding determination that due process claim was inadequately briefed). Nevertheless, we emphasize that our holdings in *Delgado* and the present case are premised on P.A. 15-84, § 1,

as enacted. It is on the basis of this legislation that we hold that any *Miller* violation has been negated and that there are no separation of powers violations. See also footnote 22 of this opinion.

## III

Finally, the defendant claims that P.A. 15-84, § 1, violates his right to equal protection under the federal constitution.[24] He argues that, as a juvenile convicted of murder, he is entitled to resentencing because, pursuant to P.A. 15-84, § 6, a juvenile convicted of capital felony, in violation of General Statutes § 53a-54b,[25] is entitled to resentencing. See footnote 26 of this opinion. We are not persuaded.

The defendant's argument proceeds in three parts. First, he contends that, as a juvenile convicted of murder with a discretionary sixty year sentence, he is similarly situated to another type of juvenile offender— one who has been convicted of capital felony with a mandatory life sentence, but without an underlying sentence for murder (which is a lesser included offense of capital felony). See *State* v. *Reynolds*, 264 Conn. 1, 24 n.13, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Second, he argues that these groups are treated differently under P.A. 15-84. Under § 1 of the act, a juvenile murderer is parole eligible, but under § 6,[26] he contends, a juvenile capital felony offender's conviction may be vacated. Therefore, because the capital felony offender then lacks a conviction (and sentence), his conviction for murder is revived, he receives a new sentencing proceeding for murder, and he becomes parole eligible as a result of § 1. In other words, the murderer receives only a parole hearing, whereas the capital felony offender receives both a second sentencing *and* a parole hearing. Third, he argues that this scheme is irrational because, regardless of the length of the resulting sentence, permitting a second sentencing proceeding and parole eligibility constitutes a less severe punishment than parole eligibility alone. Because capital felony is a crime that is more severe than murder, the defendant contends, no rational basis can support denying a juvenile convicted of murder the second sentencing proceeding that is provided to a juvenile convicted of capital felony. See *State* v. *Moran*, supra, 264 Conn. 614 ("it [is] impossible to conceive of a rational basis to support treating the less serious crime more severely than the more serious crime"). We disagree that the statutory scheme is irrational.

Even if we assume that the juvenile offenders the defendant identifies are similarly situated,[27] the legislature had a rational basis for treating them differently. "If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection chal-

lenge." (Internal quotation marks omitted.) *Perez* v. *Commissioner of Correction*, 326 Conn. 357, 383, 163 A.3d 597 (2017). Under rational basis review, "[i]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature. . . . [The law] must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (Citation omitted; internal quotation marks omitted.) *Keane* v. *Fischetti*, 300 Conn. 395, 406, 13 A.3d 1089 (2011). "[T]he [statutory scheme] is presumed constitutional . . . and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . ." (Internal quotation marks omitted.) *State* v. *Moran*, supra, 264 Conn. 606.[28]

The manner in which mandatory sentences for capital felony and discretionary sentences for murder were imposed is distinct and, thus, they conceivably might have warranted distinct remedies. Specifically, a juvenile convicted of murder already had received an opportunity to make his case for leniency to a judge, whereas a juvenile convicted of capital felony had not. In this sense, offering resentencing only to the latter group would result in equal, not harsher, punishment, at least in a numerical sense—each group gets one chance to convince a judge to exercise discretion in its favor. Moreover, practical considerations potentially might have made drawing this distinction between the groups rational. Only 4 juveniles were serving mandatory life sentences for capital felony or arson murder, as compared to approximately 270 juveniles serving sentences of longer than ten years for other crimes.[29] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 1062, remarks of Sarah Eagan, Office of the Child Advocate (stating number of juveniles sentenced). Because of the judicial resources needed to conduct the proceedings, the legislature reasonably could have determined that resentencing was simply a more feasible task for a smaller group. We also note that the legislature potentially could have distinguished between actual life sentences (for capital felony) and those that are for the functional equivalent of life (for murder). Because the latter still offer the possibility of geriatric release, the legislature could have determined that this possibility was worth granting to even the most culpable offenders, particularly at an advanced age when they would likely pose a much lesser threat to society but would cost the state much more to care for. Any of these reasons suffice to pass constitutional muster.

For the previously discussed reasons, the defendant is not entitled to relief in connection with his equal protection claim.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and PALMER,

McDONALD, MULLINS and KAHN, Js., concurred.

* August 23, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] We refer to the offender's age and the hallmarks of adolescence as the *Miller* factors throughout this opinion. Specifically, a court must consider "immaturity, impetuosity, and failure to appreciate risks and consequences"; the offender's "family and home environment" and the offender's inability to extricate himself from that environment; "the circumstances of the homicide offense, including the extent of [the offender's] participation in the conduct and the way familial and peer pressures may have affected him"; the offender's "inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and "the possibility of rehabilitation . . . ." (Internal quotation marks omitted.) *State* v. *Riley*, supra, 315 Conn. 658, quoting *Miller* v. *Alabama*, supra, 567 U.S. 477–78.

[2] Section 1 of No. 15-84 of the 2015 Public Acts, codified at General Statutes (Supp. 2016) § 54-125a, provides in relevant part: "(f) (1) . . . [A] person convicted of one or more crimes committed while such person was under eighteen years of age, who is incarcerated on or after October 1, 2015, and who received a definite sentence or total effective sentence of more than ten years for such crime or crimes prior to, on or after October 1, 2015, may be allowed to go at large on parole in the discretion of the panel of the Board of Pardons and Paroles for the institution in which such person is confined, provided (A) if such person is serving a sentence of fifty years or less, such person shall be eligible for parole after serving sixty per cent of the sentence or twelve years, whichever is greater, or (B) if such person is serving a sentence of more than fifty years, such person shall be eligible for parole after serving thirty years. . . .

"(2) The board shall apply the parole eligibility rules of this subsection only with respect to the sentence for a crime or crimes committed while a person was under eighteen years of age. . . .

"(3) Whenever a person becomes eligible for parole release pursuant to this subsection, the board shall hold a hearing to determine such person's suitability for parole release. . . .

"(4) After such hearing, the board may allow such person to go at large on parole . . . if it appears . . . (C) such person has demonstrated substantial rehabilitation since the date such crime or crimes were committed considering such person's character, background and history, as demonstrated by factors, including, but not limited to, such person's correctional record, the age and circumstances of such person as of the date of the commission of the crime or crimes, whether such person has demonstrated remorse and increased maturity since the date of the commission of the crime or crimes, such person's contributions to the welfare of other persons through service, such person's efforts to overcome substance abuse, addiction, trauma, lack of education or obstacles that such person may have faced as a child or youth in the adult correctional system, the opportunities for rehabilitation in the adult correctional system and the overall degree of such person's rehabilitation considering the nature and circumstances of the crime or crimes.

"(5) After such hearing, the board shall articulate for the record its decision and the reasons for its decision. If the board determines that continued confinement is necessary, the board may reassess such person's suitability for a new parole hearing at a later date to be determined at the discretion of the board, but not earlier than two years after the date of its decision. . . ."

Section 2 of No. 15-84 of the 2015 Public Acts, codified at General Statutes (Supp. 2016) § 54-91g, provides in relevant part: "(a) If the case of a child . . . is transferred to the regular criminal docket of the Superior Court . . . and the child is convicted of a class A or B felony pursuant to such transfer, at the time of sentencing, the court shall:

"(1) Consider, in addition to any other information relevant to sentencing, the defendant's age at the time of the offense, the hallmark features of adolescence, and any scientific and psychological evidence showing the differences between a child's brain development and an adult's brain development; and

"(2) Consider, if the court proposes to sentence the child to a lengthy sentence under which it is likely that the child will die while incarcerated, how the scientific and psychological evidence described in subdivision (1) of this subsection counsels against such a sentence.

"(b) Notwithstanding the provisions of section 54-91a of the general statutes, no presentence investigation or report may be waived with respect to a child convicted of a class A or B felony. . . .

"(d) The Court Support Services Division of the Judicial Branch shall compile reference materials relating to adolescent psychological and brain development to assist courts in sentencing children pursuant to this section."

[3] "A *Miller* claim or *Miller* violation refers to the sentencing court's obligation to consider a juvenile's age and circumstances related to age at an individualized sentencing hearing as mitigating factors before imposing a sentence of life imprisonment [or its equivalent] without parole." *State* v. *Delgado*, 323 Conn. 801, 806 n.5, 151 A.3d 345 (2016). The United States Supreme Court relied on similar reasoning to decide *Graham* v. *Florida*,

560 U.S. 48, 75, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). "A *Graham* claim or *Graham* violation refers to the sentencing court's obligation to provide a meaningful opportunity for parole to a juvenile [nonhomicide offender] who is sentenced to life imprisonment [or its equivalent, regardless of parole eligibility]." *State* v. *Delgado*, supra, 806 n.5.

[4] Practice Book § 43-22 provides: "The judicial authority may at any time correct an illegal sentence or other illegal disposition, or it may correct a sentence imposed in an illegal manner or any other disposition made in an illegal manner."

[5] Article second of the constitution of Connecticut, as amended by article eighteen of the amendments, provides in relevant part: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. . . ."

[6] Our Appellate Court also has declined to apply *Miller* (or a state constitutional analogue) to sentences of less than imprisonment for life, or its functional equivalent, without parole. See *State* v. *Rivera*, 177 Conn. App. 242, 275, 172 A.3d 260 (2017) (mandatory minimum sentence of twenty-five years incarceration did not violate state constitution); *Dumas* v. *Commissioner of Correction*, 168 Conn. App. 130, 140–41, 145 A.3d 355 (sentence of thirty years incarceration did not violate federal constitution), cert. denied, 324 Conn. 901, 151 A.3d 1288 (2016); *State* v. *Logan*, 160 Conn. App. 282, 293, 125 A.3d 581 (2015) (sentence of thirty-one years incarceration did not violate federal constitution), cert. denied, 321 Conn. 906, 135 A.3d 279 (2016).

[7] Although we ordered resentencing in *Riley* and *Casiano*, those decisions predated the enactment of P.A. 15-84. Therefore, courts lacked a mechanism to grant parole eligibility for those defendants at the time. See *State* v. *Delgado*, supra, 323 Conn. 815–16.

[8] See Brief of Amici Curiae American Psychological Association et al., *Miller* v. *Alabama*, (U.S. 2012) (Nos. 10-9646 and 10-9647), 2012 WL 174239, *8 ("[a]dolescents are less able to control their impulses; they weigh the risks and rewards of possible conduct differently; and they are less able to envision the future and apprehend the consequences of their actions"); Brief of Amicus Curiae American Bar Association, *Montgomery* v. *Louisiana*, (U.S. 2016) (No. 14-280) p. 24 ("[t]he states' interest in finality, which underpins the general rule of [nonretroactivity], is particularly weak here"); Brief of Amicus Curiae Former Juvenile Court Judges, *Montgomery* v. *Louisiana*, (U.S. 2016) (No. 14-280) pp. 5–6 ("the criminal justice system is equipped to revisit the sentences of juvenile offenders pursuant to this [c]ourt's decision in *Miller*, even when those offenders' cases are no longer on direct review and even when a substantial amount of time has passed since the offense was committed").

[9] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 966, remarks of Senator John A. Kissel ("I appreciate all your efforts in working with the leadership of this committee to help move this issue forward for the betterment of the people of the [s]tate of Connecticut but also making sure that public safety is of paramount and continues to remain as paramount importance for the citizens that we represent").

[10] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., pp. 955–56, remarks of Attorney Robert Farr ("[O]ne of my personal issues here was the treatment of the victim's and the victim's families. And I didn't want to see them revictimized by having this great uncertainty. You can think in the [*Riley*] case where an individual was murdered and a sentence was imposed of 100 years. Nine years later they're now back into court again at a resentencing. . . . And so what we tried to do is—as has been pointed out is give some certainty so that in the [*Riley*] case instead of having to worry about resentencing what would have happened is in [thirty] years, [twenty-one] years from now there will be a parole hearing . . . .").

[11] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 963, remarks of Professor Sarah Russell of Quinnipiac University School of Law ("So different states—California and Delaware have decided people should go through a court system [t]o petition essentially the court for a resentencing rather than do it through a parole board . . . . So it really I think depends on the individual state [and] what structures they have in place. Some states don't even have functioning parole boards and so are relying on their court systems for a second look.").

[12] See footnote 23 of this opinion (comparing *Miller* factors and parole eligibility factors). The dissent incorrectly states that parole eligibility under P.A. 15-84 does not require the board to give any special weight to the *Miller*

factors and the diminished culpability of juvenile offenders but, rather, only permits the board to consider the *Miller* factors in determining rehabilitation. Public Act 15-84, § 1, requires the board to consider whether an inmate has demonstrated substantial rehabilitation, considering factors such as "the age and circumstances of such person *as of the date of the commission of the crime* . . . ." (Emphasis added.) The fact that the defendant's age at the time of the crime is a factor in determining whether he has demonstrated substantial rehabilitation shows that this factor is not only " 'future focused,' " as the dissent contends, but also considers whether he had diminished capacity because of his age at the time of the crime. Just because his age at the time of the crime may be considered for rehabilitative purposes does not mean it cannot also be considered for culpability purposes. If there is any doubt about this, let us clear it up: the board should, *for culpability purposes*, consider the defendant's age and circumstances as of the date of the commission of the crime. This is in line with the parole board's stated policy of giving "great weight to the diminished culpabilities of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and maturity that has been displayed when considering an offender for suitability." State of Connecticut Board of Pardons and Paroles, Annual Report 2016–2017 (2017), available at https://portal.ct.gov/-/media/BOPP/Legacy-Files/BoPPAnnualReport20162017forDASDigestpdf.pdf (last visited August 23, 2019).

[13] See footnote 8 of this opinion.

[14] The dissent, itself, never uses the words "overrule" or "wrongly decided" in relation to *Delgado*. Instead, it contends that "the majority's reliance" on *Delgado* is erroneous. Nevertheless, overruling *Delgado* must be the dissent's argument, although that can be divined only from what the dissent goes on to say is "mistake[n]" about *Delgado*.

[15] To be clear, the defendant never has argued that *Delgado* should be overruled or distinguished because either (1) *Delgado* misinterprets *Montgomery* by holding that parole eligibility negates any *Miller* violation rather than cures an existing violation, or (2) parole eligibility under P.A. 15-84 fails to cure a *Miller* violation under the federal constitution as a matter of state postconviction remedial law in light of *Casiano*.

The defendant filed his initial brief prior to this court's decision in *Delgado*. In it, he argued that parole eligibility under P.A. 15-84 did not remedy a *Miller* violation because the requirements of *Miller* could be satisfied only by resentencing. As to *Montgomery*, the defendant argued that it did not overrule this court's holding in *Casiano* that *Miller* was a watershed rule of criminal procedure, and, as such, any violation could be corrected only by resentencing. The defendant asserted separation of powers and due process claims. After this court's decision in *Delgado* was released, however, the defendant sought and received permission to file a supplemental brief, in which he conceded that *Delgado* precluded his federal *Miller* claim, although he maintained his separation of powers and due process claims, and asserted a new equal protection claim. Subsequently, in his reply brief, for the first time, the defendant argued that this court should reconsider and overrule *Delgado*, relying not on the reasoning used by the dissent but, rather, by arguing that *Delgado* violates the separation of powers doctrine embodied in article two of the state constitution, as amended by article eighteen of the amendments. In light of the fact that *Delgado* was released after the defendant filed his initial brief, we have addressed all of the claims that the defendant has raised not only in his supplemental brief but also in his reply brief, including his claim that *Delgado* should be overruled on the ground that it violates the separation of powers doctrine. We, however, do not address the dissent's contention that *Delgado* should be overruled because it misinterprets *Montgomery* and misapplies *Casiano*. The claim raised by the defendant involves the separation of powers doctrine, whereas the dissent's contention involves cruel and unusual punishment. Although both seek to overturn *Delgado*, we disagree with the dissent that these legal issues are intertwined or subsumed with the issues raised.

[16] The retroactivity outcome is the same regardless of whether it is a substantive or watershed procedural rule. As the dissent correctly points out, the framework set forth in *Teague* for determining whether a federal constitutional rule applies retroactively may be applied in a "more expansive" manner by a state than by the United States Supreme Court "where a particular state interest is better served by a broader retroactivity ruling." (Internal quotation marks omitted.) *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 64. This court in *Casiano*, however, did not necessarily apply the *Teague* framework more liberally than the court in *Montgomery*

did. Both courts determined that the rule in *Miller* was retroactive but on different grounds. Surely, the United States Supreme Court's interpretation of its own precedent—as a substantive or procedural watershed—would be helpful even to a state's application of the *Teague* framework.

[17] As a matter of fact, the reason that the defendant's original sentence violated *Miller* was because General Statutes § 54-125a (b) (1) denied the defendant the possibility of parole. See General Statutes (Rev. to 2001) § 54-125a (b) (1) ("[n]o person convicted of any of the following offenses, which was committed on or after July 1, 1981, shall be eligible for parole: . . . murder, as provided in section 53a-54a").

Although the trial court had discretion to determine the length of the defendant's sentence, it did not have discretion to grant the defendant the possibility of parole. Thus, by providing the possibility of parole through the enactment of P.A. 15-84, the legislature did not usurp the trial court's exercise of discretion to determine whether the defendant was parole eligible but, rather, modified the sentencing scheme responsible for the defendant's unconstitutional sentence.

[18] The legislature did not change the length of the defendant's sentence but, rather, provided him with the possibility of parole. The defendant conceded at oral argument—and thus we assume without deciding—that if, post-*Miller*, all defendants must be resentenced, it is possible that a particular defendant could be sentenced to a longer period of incarceration than he originally received. P.A. 15-84, § 1, on the other hand, ensures that juvenile defendants with a sentence of more than ten years of incarceration, who did not have the benefit of *Miller* at the time of sentencing, would have their sentences mitigated, and potentially spend less time incarcerated, by providing the possibility of parole. See *State* v. *Campbell*, supra, 224 Conn. 178 ("it [is] proper to construe broadly a remedial statute designed to curb the ill effects stemming from wide judicial discretion in sentencing prisoners for similar offenses" [internal quotation marks omitted]).

[19] Our analysis accords with other jurisdictions that have held that the legislature does not intrude on the realm of the judiciary by retroactively changing a sentencing scheme to create more lenient penalty provisions. See *State ex rel. Esteen* v. *State*, 239 So. 3d 233, 237 (La. 2018) ("[T]he legislature exercised its exclusive authority to determine the length of punishment for crimes classified as felonies, and further declared those more lenient penalties shall be applied retroactively to those already sentenced. Nothing in the constitution prohibits the legislature from enacting more lenient penalty provisions and declaring they be applied retroactively in the interest of fairness in sentencing."); see also *State* v. *Vera*, 235 Ariz. 571, 576–77, 334 P.3d 754 (App. 2014) (legislature did not violate separation of powers by providing defendant with possibility of parole after sentencing), review denied, Arizona Supreme Court (March 17, 2015), cert. denied, U.S.     , 136 S. Ct. 121, 193 L. Ed. 2d 95 (2015).

[20] The rejected provision provides: "No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances herein after expressly directed or permitted." Journal of the Proceedings of the Convention of Delegates Convened at Hartford, August 26, 1818 (1901) p. 78; see *Norwalk Street Railway Co.'s Appeal*, 69 Conn. 576, 604, 37 A. 1080 (1897) (*Baldwin, J.*, dissenting).

[21] For example, unlike Connecticut, "Massachusetts had a . . . colonial heritage, colored by numerous perceived injustices at the hands of various royal mandates. Not surprisingly, revolutionary political leaders drafting the Massachusetts Constitution of 1780 provided expressly for the separation of powers. Other states, including Maryland, New Hampshire, North Carolina, and Virginia, did likewise." (Footnotes omitted.) E. Peters, supra, 81 Minn. L. Rev. 1552–53; see also, e.g., Mass. Const., pt. 1, art. XXX ("[i]n the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them").

[22] Rather than implicating separation of powers issues, by retroactively modifying the sentencing scheme, P.A. 15-84, § 1, presents the possibility of an ex post facto issue. However, because P.A. 15-84, § 1, does not increase the length of time that the defendant will be incarcerated but, rather, provides for the possibility that he will be released on parole sooner than the expiration of his sentence, P.A. 15-84, § 1, does not present any ex post facto concerns. See *Johnson* v. *Commissioner of Correction*, 258 Conn. 804, 818, 786 A.2d 1091 (2002) ("[T]he primary focus of an ex post facto claim is the probability of increased punishment. . . . [T]he new law [must] [create] a

genuine risk that [an individual] will be incarcerated longer under that new law than under the old law."); see also *Perez* v. *Commissioner of Correction*, 326 Conn. 357, 377, 163 A.3d 597 (2017) (amendments to parole eligibility statute did not give rise to ex post facto issue because "the challenged parole hearing provision does not increase the petitioner's overall sentence, alter his initial parole eligibility date, or change the standard used by the [B]oard [of Pardons and Paroles] to determine parole suitability").

We note, however, that should the legislature amend or repeal P.A. 15-84, § 1, possible ex post facto issues might arise. See *Petaway* v. *Commissioner of Correction*, 160 Conn. App. 727, 733, 125 A.3d 1053 (2015) (if there is change in law affecting parole eligibility, such change violates ex post facto clause if change "extend[s] the length of [a defendant's] incarceration or delay[s] the date of his first eligibility for parole consideration beyond the time periods in existence at the time of his criminal conduct"), cert. dismissed, 324 Conn. 912, 153 A.3d 1288 (2017). Under those circumstances, criminal defendants possibly could file a motion to correct an illegal sentence or a petition for a writ of habeas corpus.

[23] Compare footnote 1 of this opinion (reciting *Miller* factors), with P.A. 15-84, § 1, codified at General Statutes (Supp. 2016) § 54-125a (f) (4) ("the board may allow such person to go at large on parole . . . if it appears . . . [C] such person has demonstrated substantial rehabilitation since the date such crime or crimes were committed considering such person's character, background and history, as demonstrated by factors, including, but not limited to, such person's correctional record, the age and circumstances of such person as of the date of the commission of the crime or crimes, whether such person has demonstrated remorse and increased maturity since the date of the commission of the crime or crimes, such person's contributions to the welfare of other persons through service, such person's efforts to overcome substance abuse, addiction, trauma, lack of education or obstacles that such person may have faced as a child or youth in the adult correctional system, the opportunities for rehabilitation in the adult correctional system and the overall degree of such person's rehabilitation considering the nature and circumstances of the crime or crimes").

[24] The defendant's constitutional claim was not raised before the trial court. To the extent that the record supports it, we nonetheless review it under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). The defendant also cites the Connecticut constitution as a basis for his equal protection claim but provides no separate discussion. Therefore, we limit our analysis to the federal constitution. See, e.g., *Perez* v. *Commissioner of Correction*, 326 Conn. 357, 382 and n.10, 163 A.3d 597 (2017).

[25] Section 53a-54b was amended by No. 12-5, § 1, of the 2012 Public Acts to substitute "murder with special circumstances" for "capital felony." *State* v. *Medina*, 170 Conn. App. 609, 610 n.1, 155 A.3d 285, cert. denied, 325 Conn. 914, 159 A.3d 231 (2017). We refer to § 53a-54 as "capital felony" for convenience and because that is the nomenclature employed by the parties and the trial court.

[26] Section 6 of P.A. 15-84 applies only to sentencing—not convictions— and, therefore, does not appear to support the defendant's argument. Public Act No. 15-84, § 6, codified at General Statutes (Supp. 2016) § 53a-46a (a), provides in relevant part: "A person shall be subjected to the penalty of death for a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b, as amended by this act, in effect prior to April 25, 2012, only if (1) a hearing is held in accordance with the provisions of this section, and (2) such person was eighteen years of age or older at the time the offense was committed."

Rather, the defendant's argument appears to be based on P.A. 15-84, § 7, codified at General Statutes (Supp. 2016) § 53a-54b, which provides in relevant part: "A person is guilty of [capital felony] who is convicted of any of the following *and was eighteen years of age or older at the time of the offense* . . . ." (Emphasis in language added by P.A. 15-84, § 7.) The legislature specified that the amendment was retroactively "applicable to any person convicted prior to, on or after" October 1, 2015, the effective date of P.A. 15-84, § 7. We note that, shortly after the legislature's approval of P.A. 15-84, the court abolished the death penalty in *State* v. *Santiago*, supra, 318 Conn. 140.

[27] The defendant argues that the classes of juvenile offenders he identifies are similarly situated because murder is a lesser included offense of capital felony. The state points out, however, that they are distinguishable because one sentence is discretionary and the other is mandatory. Although perhaps a sufficient distinction, we nonetheless assume, without deciding, that the offenders are similarly situated for equal protection purposes.

We note one further issue with regard to the defendant's argument that

a capital felony offender will be "resentence[d] . . . ." A capital felony offender is not "resentenced" in the same way that the defendant claims he is entitled to be. Rather, a conviction and sentence for one crime (capital felony) are vacated and a sentence for a separate conviction (murder) is imposed. Conversely, the defendant wants to have a second sentencing for the same conviction (murder).

[28] The defendant argues that intermediate scrutiny applies to his claim because it involves "a significant interference with liberty . . . ." (Internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 161, 957 A.2d 407 (2008). We have rejected similar arguments before and have applied rational basis scrutiny to claims involving interference with liberty as a result of criminal punishment. E.g., *State* v. *Higgins*, 265 Conn. 35, 66, 826 A.2d 1126 (2003); *State* v. *Wright*, 246 Conn. 132, 140–41, 716 A.2d 870 (1998).

[29] Although his assertion is not in the record, the defendant claims that forty juvenile offenders were serving sentences of more than fifty years as of November, 2014. Testimony before the Judiciary Committee regarding juvenile sentencing shows that, as of March 4, 2015, "[a]pproximately [fifty] people [were] serving [a] sentence of [fifty] years or more for crimes committed under [the] age [of eighteen], most without the chance of parole." (Emphasis omitted.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 1062, remarks of Sarah Eagan, Office of the Child Advocate.